STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

KENT, Sc. SUPERIOR COURT

STATE OF RHODE ISLAND

vs.

STEPHEN R. MATTATALL

K2/79-128

HEARD BEFORE MR. JUSTICE DE ROBBIO

AND A JURY

COMMENCING OCTOBER 29, 1979

APPEARANCES:

ALFRED GOLDSTEIN, ESQUIRE
Assistant Attorney General . . . . . . . . . FOR THE STATE

PAUL J. DI MAIO, ESQUIRE . . . . . . . . . . FOR THE DEFENDANT

NOVEMBER 5, 1979

AFTERNOON SESSION

ARGUMENTS BY COUNSEL TO THE COURT

THE COURT: The Court also has another matter before the Court that it reserved decision on the motion for Judgement of Acquittal. Once again, the Court in reviewing the facts in this case has to elude to the rule that the Court must view that evidence in the light most favorable to the State without weighing the evidence, assessing any credibility to the witnesses, and in so doing determine whether there is sufficient evidence based upon that uncontradicted, untested evidence, and drawing such inferences that are consistant with guilt to make a determination as to whether the State had sufficient evidence to touch upon each and every element; and finding in a light most favorable to the State, the Court feels that there was that type of evidence presented.

So, a motion for Judgement of Acquittal necessarily has to be denied.

However, on a motion for new trial, the Court must serve more as an independent thirteenth juror, so-called, must look at the testimony, assess credibility, and then make a determination as to whether a jury was right or wrong in making its assessment, or whether a jury did,

in fact, hear. The question always bothered the Court whether it could substitute its judgement for that of the jury, and the Court would have to indicate that if its function is to assess credibility and to weigh the evidence independently, then, of course, - naturally, if the Court in weighing and assessing credibility finds that the credibility assessment was improper, that it necessarily would have to substitute its judgement.

The only evidence that the Court will elude to as far as the motion for a new trial is concerned with is the question of the identity of the operator of the vehicle. There is no question that if the matter were to be determined based upon the operation of the motor vehicle under the conditions that the motor vehicle was operated, the time, the place, and all of the surrounding circumstances, that certainly that element was certainly satisfied to the jury. But the question is one which deserves to have some analsis to make a determination as to whether this defendant was driving the motor vehicle, or whether he wasn't driving the motor vehicle in accordance with the defenses placed before this jury.

The witnesses indicate, and we must look first to the testimony of the Fredrick Leach, that when he approached the area, this defendant was behind the wheel of the car, with his hands on his face; that the driver's

door was partially opened. I mean the passenger's door was partially opened. We take the testimony of Stephen Aucotte, a Sergeant who responded, who was the first officer there in a matter of minutes, saw a flash, and in a matter of three-quarters of a mile or so responded. The matter of a couple of minutes was to the vehicle. He saw two people who looked in a semi-conscious condition, with this defendant behind the wheel of the motor vehicle. He also seen the door on the passenger's side open.

There were certain admissions about "I'm sorry, I'm sorry," which the Court will indicate in its assessment of credibility, and to the weight to be given to it; that these statements could be equivical as to their meanings under the circumstances.

The testimony was given by two other individuals that one, a participant, so-to-speak, in this enterprise, who was one by the name of James Mattatall, and his testimony is that he picked up the defendant, that they went to a bar, that they left the bar, that he was driving that motor vehicle, that he was driving in such a condition that he almost came in contact with another vehicle, that he was told to stop the vehicle, that he slowed down, that he drove to the home of Richard Marrell, and thereafter didn't remember anything.

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

If we listen to the sequence of events, this accident happened perhaps minutes thereafter. We listen to Richard David Marrell who indicates that this did happen as stated by James Mattatall, almost to a "T". There is a discrepancy as to who sat in the front, who sat in the back, discrepancy as to who led the defendant to the vehicle, or whether he was led, or not, as to the time they started drinking. These are inconsequential type of discrepancies, but the basic testimony is that he was driving down West Shore Road, when near the Venetian Gardens almost encountered an accident, driving at a high rate of speed, perhaps 60 miles per hour. He was told to slow down. He did, and then finished driving to the home of Richard Marrell.

Richard Marrell indicates that he saw the defendant and James Mattatall discussing the operation of the vehicle, and he also indicated that he saw the vehicle start from this area and leave the area, and that the defendant was not driving at this time, but that James Mattatall was driving the motor vehicle.

There were a series of witnesses that testified as to an admission that was made, and the Court was very much impressed with an attorney in the State, Anthony Grilli, who indicated that James Mattatall came down to him and indicated he was the driver of the motor vehicle.

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

Whatever reason, whatsoever, he went down there, what prompted him to say that he not only told him on that evening but he also told other individuals on other occasions that he was the driver of that motor vehicle, I can't discount an officer of the court testimony. I give the testimony of Anthony Grilli, whom I have known for years as a colleague by the Bar, as an officer of the Court, practicing as an adversary when I was in the Office of Attorney General, and one who practices before me, great weight. In fact, I gave him such great weight that at the conclusion of this trial I held James Mattatall as a potential perjurer because I felt that based upon the statements made in this Court, when he says, "I don't know," and the statement made to Mr. Grilli and the statement says that previously had been indicated at a bench conference or chamber conference with counsel that he was not a truthful individual.

So, if I take the statements and give certain weight I'd have to believe that perhaps Mr. Mattatall was behind that wheel. I was impressed with the testimony of the defendant, although the defendant has a long record, and that perhaps credibility can be tested by the fact of a record.

This defendant indicated that he elighted from the vehicle and went to the other side; that the defendant's

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

head was on his left leg. Not too inconsistant from the testimony as to where the head from one of the other witnesses said, at least twelve inches from the door.

In the course of an accident, when there is a violent collision, nobody can tell anyone what happens to the articles or the individuals that are involved in the accident. Bodies in the first car were in the rear seat. So, it is not unusual that a person would be thrown about with such violent force to bring him to the other side of the vehicle.

The door was opened, which gives some credence to t fact that it was possible for someone to elight from the motor vehicle and to go to the other side of the vehicle and get in.

The Court feels that the defendant's record, the driving or the reckless driving convictions, driving under the influence on previous occasions, the assault, I believe, with a dangerous weapon, where he received a six year sentence, was a motivating factor to this jury to convict him. That this jury took the record, and not to determine credibility alone in view and in light of the total surrounding circumstances, but took it as a contributing factor to the incident itself.

This Court in assessing its independent judgement and credibility, and assessing the weight to be given

PENGAD CO., BAYONNE, N.J. 07002 • FORM 740

to the witnesses, finds that this jury err , and, therefore, a motion for a new trial is hereby granted this defendant in this case. You have an exception.

MR. GOLDSTEIN: Thank you, your Honor.

MR. DI MAIO: Your Honor please, if I may, the defendant's indicated a wish to change his plea at this juncture. He realizes he has a right to a new trial, would like to change his plea to one of nolo contendre, if you will consider such a plea.

THE COURT: Is that your desires, Mr. Mattatall

THE DEFENDANT: Yes, sir.

THE COURT: You understand what you are doing. Do you know what you are doing?

THE DEFENDANT: Yes, sir.

THE COURT: The Court will accept the plea. It's an Alford plea indicating --

MR. DI MAIO: Yes, your Honor.

THE COURT: On a subsequent trial, there is one thing you will not have available to you, I know, and that will be the contradiction of James Mattatall, because he has the right to a Fifth Amendment at that point.

MR. DI MAIO: That is a serious consideration. One of the main reasons we are doing this, your Honor.

THE COURT: Can I see both of you at the bench.

PENGAD CO., BAYONNE, N.J. 07002 • FORM 740

(Attorneys approached the bench without the reporter)

THE COURT: Bring Mr. Mattatall before the Court.

(Defendant approached the bench)

THE COURT: The Court will accept a nolo plea under Alford. The Court has heard the facts and based upon the facts that would be re-presented, finds that you could draw sufficient inferences from those facts even though I don't believe it. I am taking the plea solely so there can be a disposition because you have served a year, just about, and you are coming up for parole.

The Court finds that based upon those facts, drawing those inferences, notwithstanding my motion for the new trial, that on a new trial a jury could draw that inference that might go consistant with guilt. As I say I reluctantly enter into this agreement - to proceed with this type of procedure, and this is for the purposes of the Parole Board, or for any one else who is concerned.

However, I will accept it under the Alford against North Carolina. I have a copy of the affidavit and a plea of nolo will be entered based upon it.

I'm going to sentence him to one year. It's going to be retroactive to the date of his incarceration which would be March 30, 1979, is that correct?

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

THE DEFENDANT: Yes.

THE COURT: That is on the driving to endanger death resulting; driving without a license, one year probation, retroactive to that date. There will be no payment of costs on that probation. The probation will be unsupervised. You do waive a presentance report.

MR. DI MAIO: With your Honor's permission. I have discussed it with my defendant.

MR. GOLDSTEIN: The State would --

THE COURT: Presentence report may be waived. The Parole Board should be notified that the plea was taken under the Alford against North Carolina. The Parol Board should further be notified that we took it based upon the granting of a motion for a new trial, and based upon all of the circumstances surrounding this case, so that when he comes up for parole, they can take all of these factors into consideration, without it being detrimental to him at that time.

MR. DI MAIO: Thank you very much, your Honor.

THE COURT: You waive the reading of the imposition of sentence.

MR. DI MAIO: Yes, please, your Honor.

THE COURT: May be waived.

MR. DI MAIO: Thank you.

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

C E R T I F I C A T I O N

I hereby certify that the foregoing is a true and accurate transcript of my stenographic notes as recorded in the above-entitled cause.

COURT STENOGRAPHER
SUPERIOR COURT

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740